## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JAMES HOLLIS** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO: 11-2551** |
| **MICHAEL J. ASTRUE,** **COMMISSIONER OF SOCIAL** **SECURITY ADMINISTRATION** | * | **SECTION: "N"(5)** |

### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motion for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 21, 22).

James Hollis, plaintiff herein, filed the subject application for DIB on January 27, 2009, alleging disability as of March 16, 2001. (Tr. pp. 118-126). In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as a lower back injury with nerve damage in both legs, pain in the lower back radiating down the outside of both legs, occasional weakness in the right leg, and

pain and burning in the right hip. (Tr. pp. 128-139). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on March 24, 2009. (Tr. pp. 77-80). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on November 19, 2009 at which plaintiff, who was represented by counsel, a Medical Expert ("ME"), and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 33-74). On June 24, 2010, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 13-32). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1)   [t]he ALJ's finding of medical improvement as of August 31, 2004, was unsupported by substantial evidence.

2)   [t]he ALJ improperly rejected the medical opinion of the plaintiff's treating physician. Consequently, the ALJ's assessment of RFC and credibility was unsupported by substantial evidence.

(Rec. doc. 21-1, p.2).

2

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant met the insured status requirements of the Social Security Act as of March 16, 2001, the date the claimant became disabled.

2.   [t]he claimant has not engaged in substantial gainful activity since March 16, 2001, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.   [a]t all times relevant to this decision, the claimant has had the following severe impairment:  Lumbar Degenerative Disc Disease and Lumbar Radiculopathy (20 CFR 404.1520(c)).

4.   [f]rom March 16, 2001 through August 30, 2004, the period during which the claimant was disabled, the severity of the claimant's lumbar degenerative disc disease equaled the criteria  of [S]ection 1.04 of 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d)).

5.   [t]he claimant was under a disability, as defined by the Social Security Act, from March 16, 2001 through August 30, 2004 (20 CFR 404.1520(d)).

6.   [m]edical improvement occurred as of August 31, 2004, the date the claimant's disability ended (20 CFR 404.1594(b)(1)).

7.   [b]eginning on August 31, 2004, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1594(f)(2)).

8.   [t]he medical improvement that has occurred is related to the ability to work because the claimant no longer has an impairment or combination of impairments that meets or medically equals a listing (20 CFR 404.1594(c)(3)(i)).

9.   [a]fter careful consideration of the entire record, the undersigned finds that, beginning on August 31, 2004, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that he is unable to work around temperature extremes or heavy industrial vibrations; unable to climb ladders, ropes, or

scaffolds; unable to stoop, crouch, or crawl on a frequent basis; and requires a sit/stand option at thirty minute intervals.

10. [b]eginning on August 31, 2004, the claimant has been unable to perform past relevant work (20 CFR 404.1565).

11. [t]he claimant was born on October 20, 1959 and was 44 years old, which is defined a younger individual age 18-49, on August 31, 2004, the date disability ended (20 CFR 404.1563).

12. [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

13. [b]eginning on August 31, 2004, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

14. [b]eginning on August 31, 2004, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

15. [t]he claimant's disability ended on August 30, 2004 (20 CFR 404.1594(f)(8)).

(Tr. pp. 21-24, 26-28).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's

4

findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which. . .has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d) (1) (A).  Once the claimant carries his initial burden, the

Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.

> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

> 4.  if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

> 5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, post work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  Fraga,

810 F.2d at 1304 (citing <u>Lawler v. Heckler</u>, 761 F.2d 195, 198 (5th Cir. 1985)).   Once  the  Commissioner  demonstrates  that  the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988); <u>Fraga</u>, 810 F.2d at 1302.

The documentary evidence admitted in the administrative proceedings below begins with records from the Pain Management/Pain Clinic  of  the  East  Jefferson  General  Hospital  ("EJGH")  where plaintiff was seen by Dr. David Shawa on June 5, 2001.  The chief complaint at the time was low back and right lower extremity pain in the L5 distribution which resulted from an incident on March 16, 2001 while carrying a heavy ladder at work.  The pain was described as a level of "7" on a scale of 1 to 10, worse with prolonged sitting and standing and relieved by lying down.  Dr. Shawa's review of the file revealed that an MRI had been performed on April 6, 2001 which was interpreted as showing degenerative changes at L4-5 and L5-S1, minimal bulging at L4-5, and slightly increased bulging  at  L5-S1  centrally  but  with  no  focal  herniations. Plaintiff was undergoing physical therapy at the time and weakness and numbness in the right lower extremity accompanied his back pain.  Upon physical examination, there was decreased sensation to pain in the lateral portion of the calf and between the first and second toes on the right.  Straight leg raising was negative but

plaintiff's gait was antalgic favoring the right leg.  Back flexion was possible to 30 degrees and was limited by pain.  The impression was lumbar radiculopathy in the right L5 distribution.  Plaintiff was administered a transforaminal epidural steroid injection ("ESI") and was prescribed Vicodin-ES.  (Tr. pp. 225-229).

Plaintiff returned to Dr. Shawa on July 2, 2001 and reported an increase in his pain for the first two weeks following his ESI which had then returned to its regular level of "6" to "7".  Straight leg raising was negative but there was decreased sensation to pain along the lateral and posterior portion of the calf on the right.  Gait was normal and flexion of the back was possible to 50 degrees and was limited by leg pain.  The impression was lumbar radiculopathy in the L5 and S1 distributions on the right.  Plaintiff was given a caudal ESI, an additional prescription for Vicodin ES, and one for Neurontin.  (Tr. pp. 220-224).  On July 17, 2001, plaintiff reported no noticeable improvement to his right leg pain.  A right L5 dorsal root ganglionotomy with pulsed radiofrequency was to be scheduled in light of the ineffectiveness of the injections.  The dosage of Neurontin was to be increased and plaintiff was also given a prescription for Elavil.  (Tr. pp. 218-219).

On August 3, 2001, plaintiff was seen by Dr. Lucien Miranne of Neurological Consultants, LLC.  Lower back and right

8

radicular leg pain associated with numbness persisted and plaintiff reported that his leg had given out several days earlier.  Urinary hesitancy was also noted.  The lumbar spine had a fairly good range of motion and motor strength was normal and 5/5 throughout but straight leg raising was positive.  The impression was persistent lumbar radiculopathy.  MRI and X-ray studies were to be ordered. (Tr. p. 192).  By August 31, 2001, plaintiff had reduced range of motion of the lumbar spine on flexion and extension and positive straight leg raising.  X-rays revealed mild multilevel degenerative changes.  An MRI produced results consistent with central disc bulging at L4-5, slight thecal sac compression centrally, and a slight bulge at L5-S1 to the left of midline.  The impression was "lumbar radiculopathy persist clinically L5"; a lumbar myelogram CT was to be scheduled.  (Tr. pp. 193-194).

Plaintiff returned to Dr. Miranne on September 26, 2001 and reported worsening right leg pain and some associated numbness. Range of motion of the lumbar spine was slightly restricted, straight leg raising was positive, and sensation was diminished primarily in the right S1 dermatomal pattern in the right foot. The recently-performed CT scan showed some disc bulging at L4-5 and L5-S1 and some very slight filling of the S1 nerve root but no compressive lesions to account for that.  No disc herniations with nerve root compression were obvious.  An EMG was

9

to be performed and plaintiff was continued on Neurontin and Elavil. (Tr. pp. 195-196). The latter testing along with nerve condition studies ("NCS") of the right leg went forward on October 11, 2011. Those studies revealed evidence of an acute L5 radiculopathy and neuropathy but no evidence of S1 nerve root compression. (Tr. pp. 249-253).

On October 19, 2001, plaintiff was seen again by Dr. Miranne for persistent right radicular leg pain associated with numbness and some weakness in the leg. Range of motion to the lumbar spine was slightly restricted and plaintiff had positive straight leg raising and bowstrings on the right as well as positive cross-straight leg raises. Motor strength was normal throughout and deep tendon reflexes were 2+ in the knees and symmetric, 1+ in the right ankle, and 2+ in the left ankle. The impression was lumbar radiculopathy but no evidence of a definite compressive lesion. A repeat MRI was to be conducted, a second opinion was contemplated, and plaintiff was given a prescription for Relafen. (Tr. pp. 197-198). On October 24, 2001, plaintiff's right radicular leg pain had worsened. By that time the repeat MRI had been done which was consistent with a large disc herniation at L4-5 with cephalad migration on the right, a clear change from prior studies. The impression was persistent radiculopathy with disc herniation at L4-5 on the right. A lumbar laminectomy was

10

discussed and was agreed upon by plaintiff.  (Tr. pp. 199-200).
Pre-operative evaluation was performed on November 12, 2001 .  (Tr.
p. 201).

Plaintiff underwent a lumbar microdiskectomy of L4-5 at
EJGH on November 15, 2001 and was discharged home the following day
with prescriptions for Vicodin and Robaxin.  (Tr. pp. 230-243).
Post-operatively, plaintiff was seen again by Dr. Miranne on
November 28, 2001 at which time he reported some right leg pain but
improvement overall.  Motor strength was normal at 5/5 throughout,
plaintiff could heel-and-toe walk normally, and sensation was
normal to light touch.  Plaintiff was to be weaned from Vicodin and
was to take Advil and Neurontin in addition to Robaxin.  ( Tr. p.
202).  Plaintiff's right leg pain was gradually resolving by
December 28, 2001 and his chief complaint was a lack of sleep.
Elavil was prescribed and although plaintiff was still being kept
off work, he was given range of motion exercises and was to
gradually increase his walking over the next six weeks to one to
two miles per day.  (Tr. p. 203).

On February 8, 2002, plaintiff returned to Dr. Miranne
and reported overall pain improvement although he did have some
back and right leg pain.  He was walking two miles per day and
tolerating the range of motion exercises.  Range of motion of the
lumbar spine was only restricted in flexion and extension and

11

straight leg raising and bowstrings were positive on the right. The impression was status-post lumbar larninectomy with slow but continued improvement.  A six-week trial of physical therapy was to be undertaken following which plaintiff's return to work activities was to be addressed.  (Tr. p. 204).  Plaintiff had some worsening of his leg pain after the first week of therapy which had since stabilized but by March 20, 2002, his pain was worse than it was the previous month with radiation down the leg.  His range of motion was restricted and straight leg raising was still positive. The impression was status-post lumbar laminectomy with worsening symptomatology.  Further MRI and X-ray studies were to be performed and plaintiff was kept off of work.  (Tr. p. 205).  Plaintiff obtained the results of those studies on April 11, 2002 which revealed normal hemilamenectomy changes at L4-5 on the right, normal post-operative changes with some perineural scarring at L4-5 on the right, and no evidence of recurrent disc herniation. Plaintiff had a fairly good range of motion of the lumbar spine with slight restriction primarily in flexion.  Straight leg raising and bowstrings were positive on the right.  Given the paucity of evidence of significant post-operative problems, plaintiff was to be restarted on physical therapy for six weeks with a return to work to be discussed after that.  (Tr. p. 206).

By May 29, 2012, plaintiff had completed a course of physical therapy that was not particularly beneficial except for the use of a TENS Unit which did seem to help his leg pain. Plaintiff had a diminished range of motion to the lumbar spine, primarily in flexion, but straight leg raising and bowstring signs were negative and motor strength was 5/5 throughout. In light of plaintiff's persistent symptomatology a second opinion with a spinal orthopedist "such as Dr. Eiserloh" was contemplated and plaintiff was kept on Neurontin and off of work pending that consultation. (Tr. p. 207).

Plaintiff was ultimately seen by Dr. Eiserloh on December 30, 2002 and reported significant back pain radiating down the right leg into the foot, "eloquently" describing an L5 distribution of the pain which was no different than it was prior to his surgery. Plaintiff described his leg pain as constant which was somewhat relieved with a TENS Unit. Back pain worsened with sitting or any activity and was relieved by lying down. Physical examination of the lumbar spine revealed a decrease in range of motion in all planes along with an exacerbation of pain. Plaintiff could heel-and-toe walk without difficulty, tandem gait was normal, and there was no bony step-off or significant lumbar spine spasm. Motor strength was 5/5 throughout with no atrophy, reflexes were

13

symmetrical bilaterally, and straight leg raising was negative. The diagnosis was low back pain, lumbar radiculopathy, a history of disc herniation, and post-lamenectomy. Dr. Eiserloh recommended a nerve root block in an attempt to lessen plaintiff's symptoms. (Tr. pp. 255-257).

Plaintiff returned to Dr. Miranne on January 15, 2003 and the results of a physical examination were stable. He was referred to Dr. John McCain for administration of the nerve blocks. (Tr. p. 208). Plaintiff received the medical branch blocks at L2 to L5 and S1 on February 13, 2003 which reduced his back pain by 30% but did nothing for his thigh and lower extremity pain. He was given a pain journal to document the anesthetic effect. (Tr. p. 209). Plaintiff returned to Dr. Eiserloh on June 19, 2003 with the chief complaints being low back, right buttock, and right leg pain with right leg numbness. Sitting and walking increased plaintiff's back and leg pain which were relieved by lying down. At this point, plaintiff had been out of work for two years and was interested in considering additional treatment. Upon physical examination, plaintiff had decreased sensation at L5 and positive straight leg raising but no atrophy and normal findings in all other motor groups and in sensation. The impression was low back pain, lumbar radiculitis, lumbar disc degeneration, and discogenic low back pain. Based upon the results of his evaluation Dr. Eiserloh

14

recommended a L4-5 posterior lumbar interbody fusion with a repeat decompression of the L5 nerve root. (Tr. pp. 258-260).

On July 14, 2003, plaintiff was seen again by Dr. Eiserloh who recalled the history of his unsuccessful post-surgical treatment. (Tr. pp. 211, 261). The administrative record also contains two copies of the second page of a treatment note from Dr. Eiserloh dated July 28, 2003 which reveal decreased range of motion of the lumbar spine with mild tenderness at the lumbosacral junction and an increase in leg pain at extremes of flexion and extension coupled with right lateral rotation. Straight leg raising was positive and there was decreased sensation to light touch in the L5 distribution. The diagnosis remained unchanged and plaintiff expressed a desire to proceed with surgery. (Tr. pp. 210, 262).

On August 1, 2003, plaintiff underwent a L4 revision laminectomy and decompression, an L4-5 posterior lumbar interbody fusion with application of intravertebral biomechanic device at L4-5, a bone plug at L4-5 with placement of posterior pedicle screws, and a posterior right iliac crest bone graft through separate fascial incision. Plaintiff's post-operative course was complicated by an ileus but he was ultimately discharged in good condition on August 4 or 5, 2003. (Tr. pp. 213-217). He was subsequently seen by Dr. Eiserloh two weeks post-surgery and

15

reported improvement from his preoperative condition. X-rays revealed good positioning of the hardware and bone graft. The impression was status post revision decompression. Plaintiff was encouraged to walk and to take Percocet and he was to remain off work for the next six months. (Tr. p. 263).

Further follow-up care with Dr. Eiserloh went forward on September 29, 2003. Plaintiff's right leg remained painful and sitting and standing increased his back and leg pain but weakness was denied. Plaintiff had a decreased range of motion in the lumbar spine, straight leg raising increased his back and right buttock, and there was decreased sensation in L5 of the right leg. The impression was status post revision decompression and fusion for which plaintiff was prescribed Vioxx and physical therapy including pool therapy. (Tr. p. 264). Plaintiff had completed physical therapy by November 10, 2003. Low back and leg pain remained and plaintiff's walking and driving were limited but plaintiff was taking no medication at the time. Plaintiff was to walk as tolerated, engage in a home exercise program, and take anti-inflammatories. He was deemed to be unable to work at this time. (Tr. pp. 265-266). On January 12, 2004, plaintiff was noted to have a decreased range of motion of the lumbar spine, a tender paraspinous muscle, and mild spasm. The impression was low back pain, residual lumbar radiculitis, and status post decompression

16

and fusion.  Vioxx, Lortab, and physical therapy were prescribed and plaintiff was still declared to be unable to work.  (Tr. pp. 267-268).

Plaintiff returned to Dr. Eiserloh on March 8, 2004 and rated his back pain as a "7" and his leg pain as an "8" to a "9", increased with sitting and activity.  Although he did not experience much in the way of pain while at physical therapy he did have pain following the sessions.  Plaintiff had a normal gait without a limp, straight leg raising was negative, and there was no spasm although there was a decreased range of motion.  X-rays of the lumbar spine revealed good alignment of the hardware and bone graft and the anterior column appeared to be fusing.  The impression was low back pain and residual radiculopathy.  Neurontin and Vioxx were recommended and plaintiff was to continue physical therapy.  (Tr. pp. 269-270).  Plaintiff reported improvement with physical therapy on April 19, 2004 with diminution of his back and leg pain although he did have significant walking intolerance.  He was continued on Lortab and physical therapy and was kept out of work.  (Tr. pp. 271-272).

Although he felt better than he did before his second surgery, plaintiff still had pain at a level of a "6" to a "9" on June 10, 2004 and he expressed frustration at the rate of his progress.  Physical examination findings were unchanged.  A further

17

MRI was recommended and plaintiff was continued on medication and physical therapy. (Tr. pp. 273-274). MRI studies were done on June 24, 2004 which revealed post-operative changes at L4-5 as compared with a previous study of April 1, 2002 but no evidence of focal disc herniation or significant central, lateral, or foraminal stenosis. (Tr. pp. 285-302). Plaintiff was next seen by Dr. Eiserloh on July 15, 2004 who noted a decreased range of motion, tender paraspinals, and pain on extension, flexion, and side bending. Motor strength was 5/5 throughout and straight leg raising was negative. With the recent MRI results in hand the doctor remarked that "[t]he operative side looks quite good" with some mild disc degeneration at L3-4 but no evidence of nerve root compression at any level. The impression was low back pain and residual radiculopathy. Repeat EMG/NCS studies were sought and plaintiff was continued on his medication. (Tr. pp. 275-276). Those tests were performed on August 30, 2004 and were interpreted as being an abnormal EMG with chronic changes of denervation in the L5 innervated muscles but no changes to suggest that an acute process was present, no evidence of a neuropathy, and the presence of normal and symmetric reflexes making involvement of the S1 root unlikely. (Tr. pp. 244-248).

Physical examination findings were unchanged when plaintiff returned to Dr. Eiserloh on September 23, 2004. In the

18

"recommendations" portion of his treatment note the doctor indicated that plaintiff's radiculopathy was chronic but with no evidence of an acute process.  Plaintiff was to engage in an eight-week course of physical therapy which was hoped to get him in a position where a functional capacity evaluation ("FCE") could be performed to determine his fitness for employment.  However, plaintiff "...will require chronic Neurontin, Vioxx and pain medicine." (Tr. pp. 277-278).  Plaintiff continued to complain of back pain radiating into the legs on December 2, 2004 that increased with activity and decreased with rest but without any pain-free moments.  The lumbar spine had a decreased range of motion and tender paraspinals but motor, sensory, and reflex functions were normal.  Dr. Eiserloh opined that plaintiff would require long-term medications and a consultation with Dr. Ortenberg was contemplated.  (Tr. p. 279).

Plaintiff's symptoms remained unchanged on February 14, 2005 and he was on Anaprox at the time.  Dr. Eiserloh felt that plaintiff had reached maximum medical improvement and that he "...require[d] permanent sedentary-type duty status with frequent position changes, no lifting over five to ten pounds." Vocational rehabilitation and comprehensive pain management were also felt to be required.  (Tr. p. 280).  By April 11, 2005, plaintiff was also taking Lortab 10 in addition to Anaprox.  Physical examination

findings were unchanged.  Plaintiff was referred to Dr. Joseph Crapanzano for a possible dorsal column stimulator.  (Tr. p. 281).

Pursuant to the referral, plaintiff was evaluated by Dr. Crapanzano on June 2, 2005 for continued complaints of low back pain radiating down the lower extremities, the right worse than the left.  Medication included alternating doses of Norco and Vicodin as well as Naproxen.  Upon physical examination, plaintiff had a normal gait, bilaterally symmetrical muscle development, and normal sensory and motor skills.  Straight leg raising was negative.  The impression was lumbar radiculopathy and lumbar post-laminectomy syndrome.  Various treatment modalities were discussed, plaintiff was started on Cymbalta, and ESI's were to be performed as a prelude to dorsal root ganglion radiofrequency lesioning.  (Tr. pp. 342-343).  On June 23, 2005, plaintiff reported that he was unable to tolerate Cymbalta.  He was administered an ESI at L5-S1 and tolerated the procedure well with no adverse sequelae.  A follow-up evaluation was to be scheduled.  (Tr. p. 341).  On July 13, 2005, plaintiff indicated that the ESI had resolved his left leg radicular pain but it remained in the right leg at a level of "8".  Another ESI was administered and plaintiff again tolerated the procedure well.  (Tr. p. 340).

Given the "very good relief" obtained through the serial ESI's, on August 11, 2005 Dr. Crapanzano elected to proceed with a

20

dorsal root ganglion radiofrequency lesioning.  Plaintiff tolerated the procedure well but stimulation could not be obtained on the right side.  (Tr. pp. 338-339).  On October 14, 2005, plaintiff reported that the radiofrequency lesioning had provided him with good results for the first three to four weeks but that some of his pain had returned leaving him with 30% overall relief from the procedure.  Strength in plaintiff's legs was equal bilaterally as was sensation.  Pain to the lower part of the back occurred with bending forward but not backwards.  Radicular symptoms down the right leg went all the way into the foot and those in the left leg stopped just above the knee.  One area in the lower back was easily palpated and was quite tender.  Plaintiff was given refills for Remeron, Robaxin, and Norco and was started on Lyrica.  Repeat radiofrequency lesioning was to be scheduled.  (Tr. p. 337).  On December 2, 2005, plaintiff was to be weaned off of Norco and was to take Ultracet in its stead; a refill of Lyrica was also authorized.  (Tr. p. 336).

On January 24 and 26, 2006, plaintiff underwent an FCE at Crescent City Physical Therapy.  Based on the results of that testing, the examiner opined that plaintiff could return to sedentary-level work activity with continuous balancing and upper extremity coordination.  It was also felt that he could perform frequent crouching, kneeling, elevated work, rotation in sitting,

and walking and occasional forward bending in sitting and standing, sitting tolerance, standing tolerance, ladder climbing, stair climbing, and repetitive squatting.  During the course of this testing, straight leg raising in both the sitting and supine positions was negative. (Tr. pp. 407-411).  Plaintiff was seen again by Dr. Crapanzano on February 2, 2006 and reported an exacerbation in pain following the FCE.  He complained of constant burning pain down the right leg laterally at a "4" to "5" at its minimum and "7" to "8" at its worst, increased with activity.  Plaintiff also had pain across his back and weakness in the left leg.  A mild limp was noted but neurologic function in the lower extremities was unchanged.  Medication included Lyrica, Tramadol, and Robaxin.   The doctor's treatment note concludes with a recitation of the results of the recent FCE.  (Tr. p. 335).

Plaintiff's next visit with Dr. Crapanzano was not until October 10, 2006 with the chief complaint being back pain with some pain traveling down the legs, specifically with walking slowly. The pain was reportedly at a level of "8", constant, cramping, and sharp in nature and increased with activity.  Weakness and tingling were also present in the right leg.  Upon physical examination, plaintiff was able to stand and walk without difficulty, gait was normal, and sensory and motor functions were intact in the lower extremities.   Straight leg raising was negative, deep tendon

reflexes were normal, and there was no significant paraspinous muscle spasm or tenderness. Range of motion of the lumbar spine was good with obvious slight limitations due to surgery. Plaintiff was to be re-started on physical therapy and his medications were to be refilled with the dosage of Remeron to be increased. Lortab and Lidoderm patches were also to be added to plaintiff's medication regimen. (Tr. p. 334).

On January 17, 2007, plaintiff complained of increased pain to the lateral aspect of the lower extremities, the right greater than the left, at a level of "9" that increased with all activities and decreased with lying down. Weakness and tingling in the left leg were also present. Sensory and motor functions were grossly intact and straight let raising was negative but deep tendon reflexes were diffusely diminished. There was a positive Patrick's sign with tenderness in the right hip and right lower lumbosacral region of the back and an antalgic gait was present. Range of motion in the lumbar spine was limited due to pain. Plaintiff's medications were altered slightly and he was to be rescheduled for further radiofrequency lesioning of the L5 dorsal nerve root. (Tr. pp. 332-333). The latter procedure was performed by Dr. Crapanzano on March 21, 2007 and no adverse sequelae were noted. (Tr. p. 331).

On April 12, 2007, plaintiff returned to Dr. Crapanzano and reported increased L5 distribution pain in the right leg that was associated with spasms and increased with activity.  He also complained of some weakness in the right leg.  Sensory and motor functions were intact but plaintiff possibly had some decreased strength on the right as compared with the left.  Deep tendon reflexes were diffusely diminished.  Plaintiff was administered another ESI and was given refills/prescriptions for Vicodin, Ultracet, Ultram ER, and Neurontin.  Dr. Crapanzano was optimistic that the exacerbation of plaintiff's pain would decrease over the next few weeks.  (Tr. pp. 329-330).

Plaintiff characterized his pain as a level of "9" when he was next seen by the doctor on July 5, 2007.  Straight leg raising was negative, deep tendon reflexes were diminished, but motor function was grossly intact in the lower extremities.  The doctor also noted increased muscle tone of the lumbosacral musculature.  The impression was lumbar radiculopathy and post laminectomy syndrome.  Avinza was to be substituted for Tramodal and hydrocodone preparation, the dosage of Neurontin was to be increased, and prescriptions for Robaxin and Remeron were refilled. A repeat ESI was to be scheduled and spinal cord stimulator therapy was discussed.  (Tr. p. 328).  MRI testing went forward on August 14, 2007 and revealed post surgical changes at the L4-5 level with

24

evidence of a posterior lumbar fusion and interbody fusion at that level.  Overall, the findings were not significantly different when compared to a previous study done on June 24, 2004.  (Tr. pp. 283-284).

Plaintiff was seen again by Dr. Crapanzano for a medication refill on August 21, 2007.  He complained of an exacerbation of his pain when standing for long periods of time and some weakness in the right leg.  Nevertheless, plaintiff was described as "...highly functional taking care of his wife who has had a stroke as well as caring for his 11-year-old child." Neurologic functioning was intact.  The doctor was to arrange for a neuropsychiatric evaluation and the formation of a treatment plan to facilitate daily functioning and coping with chronic pain.  (Tr. p. 327).  Plaintiff's pain remained when he was seen again by Dr. Crapanzano on September 18, 2007 and neurologic function remained unchanged in the lower extremities.  Refills for Ultram ER and Ultracet were authorized.  (Tr. p. 326).  Complaints of pain continued on January 29, 2008 but plaintiff was tolerating his medications and was actively involved in the care of his wife. Plaintiff had a very mildly antalgic gait and appeared to be in some discomfort as he moved from sitting to a standing position. He had no pain or tenderness to the lower lumbsacral region or to the sacroiliac joints.  Straight leg raising was accomplished to 90

degrees but deep tendon reflexes were unable to be elicited.
Plaintiff's pain medications were adjusted and he was also given a
supply of Cialis.  (Tr. p. 325).

Plaintiff's condition was essentially unchanged when he
returned to Dr. Crapanzano on June 19, 2008 for medication refills.
(Tr. p. 324.)  He still had decreased range of motion of the lumbar
spine on September 16, 2008 as well as some paraspinous tenderness
when standing.  Muscle development in the lower extremities was
symmetrical bilaterally with no edema.  The doctor noted that
plaintiff was somewhat depressed, particularly over the fact that
he was attempting to obtain employment but had been unable to find
an employer who was willing to hire him with his medical issues.
Lyrica was to be substituted for Neurontin.  In the concluding
portion of the treatment note, Dr. Crapanzano remarked that
plaintiff had been unable to find employment at the sedentary level
and stated that plaintiff "...wants total disability status."
Alternatively, the doctor opined, if plaintiff was unable to obtain
a job but total disability was not an option, plaintiff should
receive some type of vocational rehabilitation so he could be
trained for some type of work.  (Tr. pp. 321-322).  On December 11,
2008 Celebrex was added to plaintiff's medication regimen.  He was
noted to exercise on a regular basis.  Spinal cord stimulator
therapy was again discussed and plaintiff was to be referred back

to Dr. Eiserloh for further evaluation.  A psychological evaluation was also considered and Lexapro was to be substituted for Remeron. (Tr. pp. 319-320).

On March 11, 2009, a Administration Medical Consultant ("MC") reviewed plaintiff's file and set forth his findings in a "Physical Residual Functional Capacity Assessment" form.  There, the MC found that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could stand and/or walk for four hours per eight-hour workday and sit for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/ropes/scaffolds and had other postural limitations; had no manipulative, visual, or communicative limitations; and, was to avoid concentrated exposure to vibration.  Plaintiff was deemed to be partially credible.  (Tr. pp. 345-353).  On March 20, 2009, and Administration Psychological Consultant ("PC") reviewed plaintiff's file and found that there was insufficient evidence upon which to conclude that plaintiff suffered from a mental impairment.  (Tr. pp. 355-368).  A second "Physical Residual Functional Capacity Assessment" form was completed by an Administration Single Decisionmaker ("SDM") on March 23, 2009.  The findings on that form were essentially the same as the previous one except for the SDM noting that the opinions that had been rendered by Drs. Eiserloh, Miranne, and

27

Crapanzano as to whether or not plaintiff could work embraced an issue that was reserved for the Commissioner. (Tr. pp. 369-376).

Plaintiff was seen again by Dr. Crapanzano on March 31, 2009 for complaints of continued lower back pain and right lateral leg pain. Muscle development in the lower extremities was symmetrical bilaterally. Straight leg raising was mildly positive, the right greater than the left. Given plaintiff's pain in the L5 distribution, Dr. Crapanzano again recommended that he be re-evaluated for possible L5 nerve root compression which was one level below his spinal fusion. Plaintiff's medications were refilled. (Tr. p. 388). Plaintiff's leg pain was at a level of "7" when he was next seen on June 30, 2009, increased with walking, standing, sitting, and climbing stairs. There was no numbness or tingling but plaintiff did complain of weakness in the right leg. Plaintiff was able to stand and walk without difficulty and neurologic and sensory motor functions were intact. The impression continued to be lumbar radiculopathy and lumbar post-laminectomy syndrome. Plaintiff's medications were refilled, a repeat MRI was ordered, and recommendations were repeated for a further evaluation by Dr. Eiserloh and one in the neuropsychological field. (Tr. p. 387).

On August 18, 2009, plaintiff underwent a psychological evaluation as a prelude to possible surgery or spinal cord

28

stimulative therapy.   The results of that evaluation were as
follows: Axis I - depressive disorder, not otherwise specified,
with vegetative and anxious features and pain disorder associated
with both psychological factors and a general medical condition;
Axis II - deferred with dependent traits; and, Axis III - lumbar
radiculopathy, lumbar post-laminectomy syndrome, and other prior
injuries and procedures.   In light of plaintiff's moderately
depressed, distressed, and anxious moods it was recommended that he
participate in brief, focused, work-injury related psychotherapy
sessions.  (Tr. pp. 389-397).

     At the request of plaintiff's attorney, on September 15,
2009, Dr. Crapanzano authored a narrative addressing a number of
issues that had been raised by counsel respecting plaintiff's
condition.   There, the doctor recalled his diagnosis of lumbar
radiculopathy and lumbar post-laminectomy syndrome and the results
of a recent MRI that had been performed on July 30, 2009 as
demonstrating moderate disc space narrowing at L5-S1 with mild to
moderate foraminal stenosis suspected bilaterally at that level
related to bony hypertrophic charges and mild osteoarthritis of the
L5 and S1 facet joints.   Those findings were not significantly
different from those obtained on August 14, 2007.  Dr. Crapanzano
also recalled plaintiff's treatment history and referenced his
treatment note of June 30, 2009 as confirmatory evidence of nerve

root compression characterized by neuro-anatomic distribution of pain and limitation of motion of the spine and prior notes as revealing evidence of sensory loss and positive straight leg raising at about 70 to 80 degrees bilaterally, the right worse that the left.  Plaintiff reported that his pain increased with walking, standing, sitting and climbing stairs.  No objective findings up to that point in time were significant for spinal arachnoiditis.  In terms of objective evidence supporting plaintiff's allegations of severe, intractable pain, the doctor pointed to the EMG and NCS findings of an acute right L5 radiculopathy but no changes suggesting an acute process, no evidence of a neuropathay, and unlikely S1 nerve root involvement.  The doctor referred counsel to the results of the FCE regarding plaintiff's lifting/carrying abilities and those for prolonged sitting, standing, and walking. Pain was believed to significantly impair plaintiff's ability to work with sustained concentration at a consistent pace and the doctor opined that "...it would be extremely difficult for the patient to perform the vigors [sic] of a full-time job due to his ongoing pain, which is a significant distraction making gainful employment very difficult."  (Tr. pp. 398-401).

        The final piece of documentary evidence was an October 5, 2009 treatment note from Dr. Katherine Faucon, an associate of Dr. Crapanzano's.  Even with the use of medication, plaintiff rated his

pain at a level of "9" with periods of exacerbation but no apparent aggravating factors and periods when it was fairly well-controlled. Deep tendon reflexes were symmetrical but slightly hyperactive and there was good strength in the lower extremities but there was some increase in low back pain with testing the right hip flexors. Sensation was normal but straight leg lifting was positive bilaterally, the right worse than the left.  The impression was insomnia, lumbar radiculopathy, and post-laminectomy syndrome. Plaintiff was to be weaned off Lexapro and was to be started on Ambien.  Refills for Ultram, Celebrex, Lyrica, Robaxin, and Ultracet were also authorized.  (Tr. pp. 385-386).

As noted earlier, a hearing de novo before an ALJ went forward on November 19, 2009.  After the documentary exhibits were admitted into evidence Dr. George Weilepp, a ME, took the stand and was questioned by the ALJ.  Dr. Weilepp recalled plaintiff's work-related injury in March of 2001 with subsequent positive EMG studies, a laminectomy, and then a fusion in August of 2003.  For the year following the latter procedure, the doctor believed that plaintiff was functioning at a less than sedentary level with Listing 1.04(A) having been equalled.  But after August of 2004 there was no re-herniation, no rehabilitation/return to activity/release to activity but a good deal of pain, with the management of that pain determinative of plaintiff's functionality

at the light to sedentary level or even less.  Upon further questioning, the ME clarified that from the date of plaintiff's injury until August of 2004, he was functioning at a level that was equal to or less than sedentary and that it was largely a pain management issue after that point in time.  (Tr. pp. 35-41).

The ME was then tendered to plaintiff's counsel for further questioning.  Through a series of questions, counsel directed Dr. Weilepp to various exhibits in the record in an attempt to establish that plaintiff's condition continued to meet or equal the criteria of Listing 1.04(A) well past August of 2004 and perhaps even as late as December of 2008.  In answer to that line of inquiry, the doctor testified that in the absence of obesity or re-injury, plaintiff should have been capable of a restricted range of light/sedentary work subsequent to August of 2004 if his pain was effectively controlled.  However, the doctor candidly admitted that he was uncertain of the effectiveness of plaintiff's pain management and that he was in a "quandry" as to where to draw the line.  Generally, 20 to 30% of individuals such as plaintiff return to a level of functionality with pain medications and with lifestyle changes but that some difficulties were to be expected post-surgery.  When again pressed as to whether Listing-level severity continued to be satisfied, Dr. Weilepp essentially testified that certain symptoms were to be expected,

32

that there was no suggestion of further surgery, and that it was really a pain management issue, again citing the percentage of individuals who return to functionality.  The records that the ME had been presented prior to the hearing contained no X-ray evidence that plaintiff's fusion was solid or not and there was no specific release for him to return to work with pain management medications. A break in the ME's testimony was then taken to afford him an opportunity to review the results of plaintiff's recent psychological evaluation and the narrative from Dr. Crapanzano. (Tr. pp. 41-47).

Plaintiff then took the stand and was questioned by counsel.  He testified to experiencing pain every day, all day from the middle of his back through the right hip and leg and into the foot.  The pain was at a level of "5" to "6" in the morning and at a level of "8" in the afternoon.  Plaintiff was taking six pain medications at the time which caused loss of concentration and forgetfulness.  Lying down did provide relief which plaintiff estimated that he did for 1.5 to 2 hours per day.  Pain was increased with standing and sitting and plaintiff testified that he could stand comfortably for 10 to 15 minutes, could sit comfortably for 5 to 10 minutes (20 to 30 minutes if in a recliner), and walk only half a block.  An average day for plaintiff consisted of getting his son ready and driving him to school, fixing breakfast

for his wife who had recently suffered a stroke, lying down, and doing some light chores. Plaintiff would then fix lunch for his wife and lie down for another period of time before picking his son up from school. He would then fix his son a snack and drive him to the tutor. Later, plaintiff would pick his son up from the tutor, make sure he was fed and bathed, and then retire for the evening. (Tr. pp. 48-53).

Upon further questioning by the ALJ, plaintiff testified that the drive to his son's school was to 10 - 12 minutes each way and that to and from the tutor was 20 to 25 minutes each way which he did four days per week. Plaintiff had been doing those chauffering duties for over two years in addition to household chores except those requiring bending. When he was not driving or doing household chores he spent the bulk of his time lying down. He also drove his wife to the grocery store and to his own doctors' appointments as needed. Plaintiff had enlisted the aid of a tutor to assist with his son's homework because of sitting limitations. He had at one time looked into an electrical estimating job. (Tr. pp. 53-57).

Having had an opportunity to review the recently generated exhibits, the ME was then questioned further by the ALJ and plaintiff's counsel. In the course of that questioning, the ME seemed to suggest that plaintiff was able to work at the sedentary

34

level if the medications and treatment significantly improved his capabilities and in the absence of clear evidence of an acute process. However, the doctor was not able to put a percentage on the success of plaintiff's functionality. Essentially, from an objective standpoint Dr. Weilepp believed that plaintiff would be capable of sedentary work unless he suffered from too many medication side effects or he was unable to work a forty-hour week on a sustained basis. Even at the sedentary level other restrictions would be appropriate including a sit/stand option, avoidance of extreme cold and industrial vibrations, and avoidance of industrial driving. Frequent postural maneuvers with two hours of cumulative standing and walking would be allowed. Deconditioning was also a possible problem and the doctor acknowledged that he was dealing with a lot of intangibles that were not of an orthopedic nature. A need to lie down for pain relief would not be unexpected given plaintiff's condition and counsel emphasized that such a need was repeatedly documented in the record. Dr. Weilepp agreed with Dr. Eiserloh's opinion that plaintiff was permanently restricted to sedentary work with kneeling/crawling/squatting only occasionally at most and industrial driving being limited to short distances. The doctor was unable to give a definitive answer as to whether plaintiff had

difficulty sustaining balance and there was no clear evidence of a stooping problem.  (Tr. pp. 57-66).

The third witness to take the stand was Todd Capielano, a VE.  He began by classifying the demands of plaintiff's past work as a electrician as involving medium, skilled work with an SVP of 7.  The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was capable of performing sedentary work with a sit/stand option and avoidance of extreme cold and vibration.  In answer thereto, the VE testified that the individual described in the hypothetical question could not perform plaintiff's past work but that the individual possessed skills that were transferable to other jobs in the electrical industry.  That being the case, the described individual could function as a cost estimator and could also perform the unskilled jobs of inspector, cashier, and assembler, with significant numbers of such jobs existing in the national and local economies.  However, if the individual needed to lie down outside of regular break periods the identified jobs could not be performed.  The same would be true if the individual was unable to maintain attention/concentration for two-hour blocks of time.  (Tr. pp. 66-69).

Upon being tendered to plaintiff's counsel for additional questioning, the VE was asked whether the cost estimator position

36

would allow for frequent position changes between sitting and standing every five to fifteen minutes.  In answer to that question, the VE testified that although such an option would be at the will of the employer, it would be a difficult proposition and would essentially eliminate the unskilled jobs as well.  In follow-up questioning by the ALJ, the VE testified that the sit/stand option would be less problematic if it was required only every thirty minutes.  (Tr. pp. 69-71).  In a closing exchange between the ALJ and counsel, the ALJ offered his interpretation of the VE's testimony to mean that plaintiff was at a less than sedentary capability or equaled the criteria of Listing 1.04(A) from the alleged onset date to August of 2004.  For his part, counsel argued that plaintiff's condition continued to meet the criteria of Listing 1.04(A) subsequent to August of 2004 and that the ME's testimony on that point was largely equivocal.  (Tr. pp. 71-74).

In cases such as this one where a claimant is awarded disability benefits for only a closed period of time, the so-called "medical improvement" standard applies.  Waters v. Barnhart, 276 F.3d 716, 718-719 (5th Cir. 2002).  An award of benefits for only a closed period of time will be upheld if substantial evidence demonstrates that: 1) there has been medical improvement related to an individual's ability to work and 2) the individual is now able to engage in substantial gainful activity.  42 U.S.C. §423(f); 20

C.F.R. §404.1594(a).   To support a finding that disability has ended, medical improvement must be related to a claimant's ability to do work.   20 C.F.R. §404.1594(f)(4).   Medical improvement is presumed to be related to the ability to work when the individual's disability was the result of meeting the criteria of a listed impairment that is no longer met.   20 C.F.R §404.1594(c)(3)(i). The difference between the five-step sequential analysis under §404.1520 and the medical improvement standard is the allocation of the burden of proof.   Waters, 276 F.3d at 718; Green v. Astrue, 2011 WL 7049452 at *4 (W.D. La. Dec. 12, 2011), adopted, 2012 WL 135691 (W.D. La. Jan. 17, 2012).   "Under the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled."   Waters, 276 F.3d at 718 (citing 42 U.S.C. §423(f); Griego v. Sullivan, 940 F.2d 942, 943-44 (5th Cir. 1991)).

Plaintiff's first challenge to the Commissioner's decision is that the finding of medical improvement as of August 31, 2004 is not supported by substantial evidence.   For the reasons that follow, the Court believes that plaintiff's case should be remanded to the Commissioner for further development.

The ALJ in the present case found that from the date of plaintiff's work-related injury until August 30, 2004, his condition satisfied the criteria of Section 1.04(A) of the Listing

of Impairments.  After the latter date, however, the ALJ found that plaintiff had experienced medical improvement that was related to his ability to work because he no longer had an impairment or combination of impairments that met or equaled the criteria of Listing 1.04(A).  While plaintiff's condition may no longer have been at Listing-level severity, it is possible that he still may have been unable to perform any work and was thus disabled at step five of the §404.1520 sequential analysis.

     As the ALJ acknowledged in his written decision, plaintiff's medical records as of August 31, 2004 revealed complaints of severe, unremitting radicular pain a little over a year after the revision of his L4 laminectomy.  (Tr. p. 24).  As the ALJ further noted, the ME testified at the administrative hearing that plaintiff's condition did appear to be chronic in nature.  (Id.).  Although Dr. Weilepp testified that plaintiff's functionality was dependent on the effectiveness of his pain management, he was unable to say how successful those efforts had been and what effect the pain medications may have had on plaintiff's cognition or ability to concentrate during the relevant time period.  The fact that twenty-five to thirty percent of patients with a condition similar to that of plaintiff's may return to a level of functionality with effective pain management does not establish that plaintiff was in fact able to do so himself.

Accordingly, it will be recommended that plaintiff's case be remanded to the Commissioner for further development of the record as to the need for pain management medication during the relevant time period and how that may have affected plaintiff's cognition.

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further proceedings consistent with the Court's opinion.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this  4th  day of    March  , 2013.

UNITED STATES MAGISTRATE JUDGE

40